Jorge V. Domínguez, Francisco Soto Gras, Antonia Q. Viuda de Quiñones, José Ramón Quiñones, Segismundo Quiñones, Juana Manuela Rodríguez de Willoughby, Palmira McCormick de Schuck, Dionisio Trigo, Alvaro Trigo, María Rafaela Chloris McCormick y Murdock de McKinlay y Jaime Zubiaurre, demandantes y apelantes, *v.* Rafael Fabián y Fabián,

No. 3839.—*Visto:* Mayo 7, 1926. *Resuelto:* Noviembre 29, 1926.

1. Fraude — Acciones — Evidencia — Prueba Necesaria para Establecer el Fraude.—Si bien el fraude puede establecerse por medio de prueba circunstancial, su existencia, sin embargo, no puede quedar establecida por simples conclusiones, conjeturas o sospechas.

2. Corporaciones—Oficiales y Agentes—Derechos, Deberes y Responsabilidades en Cuanto a la Corporación y sus Miembros—Acciones Ejercitadas por Accionistas Contra Directores—Apelación.—En este caso—acción para exigir responsabilidad por omisiones en los deberes de un cargo—se alegó en apelación que probados los hechos imputados y la intervención del demandado en ellos, a éste correspondía descargarse, mostrando que hizo cuanto pudo para que las cosas ocurrieran de distinta manera. *Se resolvió:* que cuando los hechos imputados no se prueban tal cual se alegan ni menos que el demandado interviniera en los mismos, no existía base para considerar la alegación mencionada.

3. Apelación y Error—Revisión—Discreción de la Corte Inferior—Imposición de Costas.—Cuando la corte ejerce su discreción al imponer las costas y por el resultado del pleito no hay motivos para revocar, dicho pronunciamiento de la sentencia debe confirmarse.

Sentencia de *M. Rodríguez Serra*, J. (San Juan, Segundo Distrito), declarando sin lugar la demanda, con costas. *Confirmada.*

*Jorge V. Domínguez* y *F. Soto Gras*, abogados de los apelantes; *Henry G. Molina*, abogado del apelado.

El Juez Asociado Señor Franco Soto, emitió la opinión del tribunal.

Los demandantes como accionistas de la Central Boca Chica, corporación domiciliada e incorporada en la Repú-

blica Dominicana, instituyeron esta acción para recobrar del demandado Rafael Fabián la suma de $65,300 en concepto de daños y perjuicios como consecuencia de ciertos actos fraudulentos o de negligencia que se alegan realizados por dicho demandado mientras desempeñaba los cargos de presidente del Banco Territorial y Agrícola y vicepresidente de la Central Boca Chica, privándoles así del valor de sus acciones.

La corte inferior declaró sin lugar la demanda y en su opinión se hace un resumen de las alegaciones, así como de sus conclusiones, en la siguiente forma:

"Se alega que el Sr. Fabián era uno de los administradores y el primer vice-presidente del Consejo de Administración de la referida Central Boca Chica, antes del 15 de Septiembre de 1922, y hasta el 14 de Octubre del mismo año; y a la vez, Presidente del Banco Territorial y Agrícola de Puerto Rico. Este Banco había adquirido, como garantía colateral de un préstamo refaccionario, ciertos bonos hipotecarios de la Central, por valor de $350,000, que emitiera la Compañía anónima Central Boca Chica. El Banco era _trustee,_ representante de los Tenedores de los bonos. Ni los intereses ni los plazos vencidos de la deuda así garantida habían sido pagados: por lo que el Banco procedió a la ejecución del crédito, habiéndose opuesto la Central, ante los Tribunales de Santo Domingo. El 15 de Septiembre de 1922 el Presidente de la Compañía Sr. Miguel Guerra Parra vino a Puerto Rico, y adoptó cierto acuerdo con el Banco para transar las diferencias existentes entre el Banco y la Compañía anónima y también entre el Banco y otra Compañía denominada "Industrial y Comercial" de Santo Domingo de que Guerra era socio. El Sr. Miguel Guerra Parra al llegar al acuerdo con el Banco ostentaba el doble carácter de vice-presidente de la Compañía Industrial y Comercial y accionista principal de la Central Boca Chica. En relación con dicho acuerdo, en Asamblea General de accionistas de la Compañía anónima Boca Chica, el 5 de Octubre de 1922, que estuvo según alegan los demandantes, bajo el control absoluto del demandado y del Sr. Guerra Parra, se acordó desistir de los procedimientos iniciados ante los Tribunales Dominicanos en oposición a la gestión judicial de cobro del Banco Territorial y Agrícola de Puerto Rico. Tales arreglos eran parte integrante de un plan de reorganización, y fueron realizados con el deliberado propósito de salvar los intereses de la Compañía deudora y de reorganizar

sus negocios a fin de ponerlos en estado de completa solvencia. En cuanto al Banco concernía, el acuerdo establecía una prórroga de su crédito, por el plazo de 12 años, con las garantías anteriores; y la compañía deudora, por su parte, se comprometía a no entorpecer o demorar la ejecución de los bienes embargados; y de este acuerdo quedó encargado, entre otros, el demandado Sr. Fabián en su doble carácter de Presidente y principal accionista del Banco Territorial y de Vice-Presidente de la Compañía deudora y de miembro de su Consejo y de Administrador representante de los accionistas de Puerto Rico. Y alegan los demandantes que con tal capacidad el Sr. Fabián hizo formal promesa al Sr. Soto Gras, de que el Banco no ultimaría gestión alguna que perjudicase los intereses de los accionistas de la Compañía deudora; y confiando en la promesa el Sr. Soto Gras desistió de realizar un proyectado viaje a Santo Domingo, representando a los accionistas de Puerto Rico para defender y proteger ante la Asamblea General sus derechos e intereses; y que bajo la confianza de que la promesa se cumpliría y en vista del plan de reorganización adoptado, los demandantes no hicieron gestión alguna en defensa de sus intereses. Que el Sr. Fabián en vez de cumplir el acuerdo, se confabuló con otras personas para constituir, en violación del acuerdo y al amparo de las leyes de la República Dominicana, una corporación llamada ''Andrés Sugar Company'' de la cual es uno de los administradores. Que el objeto aparente de la constitución de esa compañía fué dar cumplimiento al acuerdo antes referido, que era en beneficio de los accionistas de la Central Boca Chica, pero en realidad resultó solamente en provecho del propio demandado y de otras personas, que así utilizaron las ventajas del plan de reorganización, adjudicándose los bienes de la Central Boca Chica, privando a los demandantes de sus derechos sobre los mismos. Que no existía en aquel entonces razón o motivo que impidiera al demandado, en su carácter de Administrador y Vice-Presidente de la Central Boca Chica, al cumplimiento de los términos del acuerdo con el Banco para Beneficio de todos los accionistas. Que ni la Andrés Sugar Company ni las personas que la organizaron aportaron cantidad alguna de dinero efectivo, ni bienes para el pago de parte o todo el crédito del Banco Territorial y Agrícola; que la ejecución del crédito fué ficticia y debióse a la influencia y gestión del demandado, como Presidente y mayor accionista del mismo, y a la confianza que en él depositaron los accionistas demandantes y a su influencia, además, como Vice-Presidente y uno de los mayores accionistas de la Compañía Central Boca Chica. Que el acuerdo del Banco fué incumplido por el Sr. Fabián y sus aso-

eiados, entre otros extremos, especialmente en el de haber incorporado
la nueva entidad bajo las leyes de la República Dominicana y no
bajo las de Puerto Rico donde residen los demandantes.   Que Fa-
bián consintió que ciertos accionistas, amigos personales de él, y él
mismo, recibieran los equivalentes íntegros de las acciones de que
eran dueños, del capital social de la Central Boca Chica, y con
pretexto de ciertas operaciones financieras garantidas con los pro-
pios bienes y frutos de la Central Boca Chica.   Que en Julio de
1921 dicha Central tenía un activo fijo de $1,404,955.07, y en la
fecha de la adjudicación a la Andrés Sugar Company de los bienes
de la Central Boca Chica o sea el 14 de Octubre de 1922, esos bie-
nes tenían un valor neto de $755,491.15 excluyendo deudas y obli-
gaciones, siendo el valor total emitido de sus acciones $750,000 y
por tanto el valor efectivo de cada acción $100.00, oro americano.
Los demandantes piden que se condene al demandado a pagarles el
valor de sus respectivas acciones, montante a $65,000, más los inte-
reses correspondientes.

"Tras diversos incidentes en que hubo amplia discusión, y luego
de haberse contestado la demanda, tuvo lugar la vista del caso y
fué terminado el juicio que duró varios días, el 27 de febrero úl-
timo. . . . .

"Expondremos, después de una detenida consideración de los
documentos ofrecidos como prueba, así como de las declaraciones de
los distintos testigos en el juicio, aquellas conclusiones que nos pa-
rezcan suficientes para resolución del caso a fin de no ser demasiado
extensos.

"La Central Boca Chica en la época a que se refiere la demanda
no había pagado sus deudas, hipotecarias o de otra índole; no había
pagado los plazos del capital ni intereses, garantidos con la hipoteca,
de que el Banco Territorial y Agrícola de Puerto Rico era Trustee,
ni tampoco el crédito refaccionario anticipado por la Compañía In-
dustrial y Comercial, a la que adeudaba $115,890.86 en Julio 31 de
1921.   Según se desprende de la Memoria de la Compañía de ese
año, la zafra produjo pérdidas; la crisis azucarera empezaba a sen-
tirse, y continuó afectándole, de modo que los negocios, en 1922,
habían empeorado.   Las gestiones para obtener un nuevo préstamo
refaccionario que permitiera hacer la cosecha 1921–1922, no tuvie-
ron éxito.   En la imposibilidad de cobrar su deuda, el Banco Terri-
torial envió a uno de sus directores, Mr. Walker, a Santo Domingo,
en Febrero, 1922, para investigar la situación y tratar de salvarla.
El Banco decidió ejecutar la hipoteca, pero deseaba dejar la em-
presa en condiciones de poder continuar sus negocios.   Al enterarse

de la ejecución, el Sr. Soto Gras, uno de los demandantes, conferenció con el Sr. Fabián, quien le informó ser cierto que el Banco ejecutaba, y que la actitud de esa institución no sería perjudicial a los accionistas; que el Banco no les era hostil. El Sr. Soto Gras, a pesar de quedar satisfecho de su conferencia con el Sr. Fabián, obtuvo de algunos accionistas, residentes en Puerto Rico, de la Central Boca Chica, le designasen, junto con el Sr. McCormick, como sus agentes o apoderados para concurrir a la Asamblea que el 10 de Junio de 1922 se celebraría por la Compañía Boca Chica en Santo Domingo. Dispuestos a embarcar, suplicaron, por cable, al Sr. Guerra Parra, la posposición de la Asamblea, porque el vapor llegaría tarde a Santo Domingo. El Sr. Guerra Parra, accionista fuerte de la Compañía ejecutada, vino a Puerto Rico, celebró una conferencia con el Sr. Soto Gras, y continuó viaje para España para obtener del capitalista Sr. Olegario Riera un nuevo préstamo refaccionario a favor de la Central Boca Chica. Este Sr. Riera era socio de la Compañía Industrial y Comercial de que era presidente Guerra Parra y acreedora también, como hemos dicho, de Boca Chica; además era accionista de Boca Chica. El Sr. Guerra Parra, como Presidente de la Industrial y Comercial, alegaba ciertas preferencias o gravamen sobre los bienes muebles de la Central, los había embargado, desposeyéndola de algunos. No hay duda de que el Banco actuaba bajo la impresión de que en su procedimiento ejecutivo, encontraba la oposición de la Central Boca Chica, y de la Compañía Industrial y Comercial; y que en la transacción o acuerdo celebrado con Guerra Parra era entendido que dicha Compañía Industrial y Comercial, en vez de entorpecer la ejecución, apoyaría al Banco, desistiendo de sus gestiones judiciales. No ha habido prueba de que la oposición de la Central Boca Chica tuviese buen fundamento; al parecer, con ella sólo se trataba de ganar tiempo para conseguir un préstamo que permitiese recoger los bonos y solventar otras deudas de la Compañía. No ha habido prueba alguna tendente a demostrar que la hipoteca a favor del Banco tuviese algún defecto o vicio que la anulase; y es de presumir que el Banco Territorial, en ejercicio de sus derechos y en cumplimiento de sus deberes como *trustee*, debió hacer lo que hizo, esto es, gestionar el cobro de la deuda, judicialmente. No se ha probado concreta y detalladamente, cuál fuera el plan de reorganización previamente convenido, ni la ingerencia o participación real del demandado en el mismo. Se ha demostrado que los Sres. Walker y Martínez Domínguez, como mandatarios especiales del Banco, investidos de amplios poderes llegaron a una solución del asunto satisfactoria para

el Banco. El arreglo fué, en sustancia, que la Compañía Industrial desistiría de la oposición al Banco, que el socio de la misma, Sr. Riera, aportaría un préstamo de $100,000, garantidos con primera hipoteca representada por nuevos bonos, los cuales serían emitidos en series para Riera, el Banco, McCormick y la Industrial y Comercial por sus respectivos créditos. Se trataría de obtener de otras personas la suma de $50,000 para la refacción, y continuar el funcionamiento de la Central. La refacción fué más tarde aumentada a $150,000, y se obtuvo de una corporación denominada 'Porto Rico Sugar Developing Co.' con la garantía personal de los Sres. McCormick, Walker y Martínez Domínguez. El Sr. Fabián era Presidente de esta última Compañía, y otros de sus accionistas, los Sres. Behn Bros., Manuel González, Walker y Martínez Domínguez, ninguno de los cuales era accionista de Boca Chica. Como garantía adicional se convino organizar una nueva corporación llamada 'Andrés Sugar Company', la que sería deudora, y fué esta entidad la que obtuvo la adjudicación en el remate efectuado de los bienes de la Central Boca Chica.

"No hay prueba de que los demandantes u otros accionistas de la Boca Chica aportasen dinero efectivo o crédito u otros valores para solventar las deudas vencidas y evitar la subasta. Los Sres. McCormick, Walker y Martínez Domínguez con su garantía personal obtuvieron como ya dijimos de la Porto Rico Sugar Developing Co. los $150,000 necesarios para que la Andrés Sugar Company pusiera en marcha la Central que se había adjudicado.

"No se ha probado que la situación de insolvencia de la Compañía Boca Chica en 1921 y 1922 se debiera en todo o en parte a la falta de cumplimiento, por el demandado, de sus deberes legales como coadministrador del fundo, esto es, como vocal de su directiva. De la memoria o estado general de la Compañía, descriptiva de las operaciones y negocios desde Agosto 1, 1920, al 31 de Julio, 1921, suscrita por los Sres. Guerra Parra, Olegario Riera y Jesús Cobián, Presidente, Tesorero y Secretario respectivamente, comentando la desfavorable situación de los negocios se expone lo siguiente, bajo el epígrafe 'Estado de Ganancias y Pérdidas'—Pág. 16. El azúcar que teníamos en existencia al 'finalizar el último ejercicio, avaluado en $304,434.61 ha sido realizado a un precio inferior al estipulado en el inventario (al principiar este ejercicio) dejando una pérdida de $166,726.04. . . . .' En la página 18, se dice—'Pérdida este año (1921) $47,867.79.' Del examen del Balance, página 19, resulta que el total de las deudas montaba a $588,968.42.

"Como causas de la situación, señala la memoria, el bajo precio

del azúcar, comparado con el de los anteriores años, y los altos salarios del personal—causas que afectaban en aquella época a todas las empresas azucareras.

"No se ha probado concretamente cuáles fueran las actuaciones en todo ese negocio, del demandado Sr. Fabián. Mucho menos que controlase la asamblea de accionistas de Boca Chica, al adoptar sus acuerdos relativos a la transacción con el Banco. No sabemos el número de sus acciones en la Compañía de la Central Boca Chica, en el Banco Territorial, ni en la Porto Rico Sugar Developing Company. No podemos presumir que, por el mero hecho de ser accionista de esas compañías, tuviera el control o decidiera con su voto personal o por medio de su apoderado, los distintos acuerdos para ultimar la negociación final. No se ha probado qué clase de conocimiento tuviera Fabián de los hechos de la transacción, algunos de los cuales se realizaron estando él ausente de Puerto Rico, en Europa. No se ha probado que fuera accionista de la nueva Compañía Andrés Sugar Co. al organizarse y adjudicársele la Central, o después. Por el contrario la prueba ofrecida en este punto es negativa; en consecuencia, no puede apreciarse cuál haya sido el beneficio derivado por él de la alegada combinación, si es que en realidad ha tenido alguno.

"Por tales razones, no habiéndose probado los hechos esenciales de la demanda, debe ser desestimada y declarada sin lugar."

Aunque los apelantes señalan en su alegato la comisión de diversos errores por la corte inferior, en realidad el punto a resolver se contrae a una cuestión de hecho, o sea, si el demandado intervino de algún modo en los hechos que se le imputan en la demanda, o en otros términos, si la prueba demostró los actos de fraude o el incumplimiento de un deber por omisiones, de todo lo cual se trata de hacer responsable al demandado.

[1] Hemos examinado cuidadosamente la extensa prueba que fué practicada por los apelantes y concurrimos con la corte inferior en que no se probó que el demandado tuviera ingerencia o participación en el plan de reorganización que dió por resultado el remate de los bienes de la Central Boca Chica en el procedimiento hipotecario seguido por el Banco Territorial, adjudicándose a la Andrés Sugar Co., nueva corporación que se formó de acuerdo con las leyes de la

República Dominicana, y asimismo quedó sin demostrar la afirmación categórica de la demanda de que el demandado fué uno de los organizadores de la corporación Andrés Sugar Co., ni tampoco que fuera accionista de la misma. Los apelantes sostienen, sin embargo, que la corte inferior erró al no considerar la evidencia circunstancial que había de producir la certeza moral de la participación del demandado en las negociaciones que tuvieron por objeto el plan de reorganización a que se refiere la corte inferior. El mero hecho de ser el demandado presidente del Banco Territorial, accionista de la Central Boca Chica, poderdante de Rafael Martínez Domínguez y unido a éstos por razón de otros negocios, no son circunstancias por sí solas para demostrar la relación del demandado en la conspiración o actos fraudulentos que los apelantes alegan que fueron fraguados entre aquellas personas y otras para ser privados del valor de sus acciones en la Central Boca Chica. No tenemos dudas que el dolo o fraude puede establecerse por prueba circunstancial, pero en ningún caso su existencia puede quedar establecida por simples conclusiones, conjeturas o sospechas. *Gómez* v. *Banco,* 34 D.P.R. 148; *Sabalier* v. *Iglesias et al.,* 34 D.P.R. 352. Desde julio de 1922 a enero de 1923 el demandado estaba ausente en España. En septiembre 15, 1922, la comisión de turno del banco tomó un acuerdo que fué ratificado por el consejo de administración en septiembre 18, 1922, estableciendo las bases para asegurar la deuda hipotecaria de la Central Boca Chica y cuyo cobro estaba en curso ante los tribunales de la República Dominicana, pero con oposición de la corporación demandada por haber atacado la nulidad de la hipoteca. Dicho acuerdo en lo pertinente, dice así:

"Y se tomaron los acuerdos siguientes:

"2. En este estado la sesión, su Presidente Sr. Walker, pasó a informar verbalmente a la Comisión sobre las diligencias practicadas para el arreglo del asunto de la Central Boca Chica de Santo Domingo en tramitación judicial cuya ejecución se dificulta en vista

de los obstáculos que a su fin ha presentado la Compañía Industrial y Comercial de Santo Domingo, R. D.; y después de discutido suficientemente el caso por todos los señores que componen esta Comisión, se acuerda llegar a un convenio con dicha Compañía, sobre las siguientes bases:

"(1ª) La Compañía Industrial y Comercial, en vez de entorpecer la ejecución, ayudará al Banco retirando sus mociones a la Corte y uniéndose al Banco para que esa ejecución se realice seguidamente.

"(2ª) Una vez ejecutada la Central y pasada su propiedad al Banco, se emitirán dos emisiones de bonos como sigue:

"Bonos A. Por trescientos mil dólares, para adjudicarse al Banco en pago de doscientos mil dólares a cuenta de su crédito, y los cien mil dólares restantes para darlos a las personas o entidades que aporten esa suma con el fin de poner la Central en condiciones de moler en la próxima zafra de azúcar, (véase ampliación abajo).

"Bonos B. Por ciento sesenta mil dólares para el Banco y ciento doce mil dólares para pagar el crédito de la Compañía Industrial y Comercial.

"De los bonos A. y B. que por trescientos sesenta mil dólares le correspondan al Banco, se dará la parte que proporcionalmente corresponda al Sr. Harry McCormick, por ser acreedor de cincuenta mil dólares contra la Central Boca Chica garantizados con igual cantidad de los anteriores.

"Tanto los bonos A. como los bonos B. se emitirán al plazo de doce años y al interés del ocho por ciento anual.

"(3ª) Se formará una nueva corporación con oficina central y absoluta en esta ciudad de San Juan, teniendo el Banco poder de investigación en cualquier tiempo.

"La Comisión acuerda facultar y faculta al Presidente Sr. Walker, para que ultime este asunto lo antes posible, pues se considera muy urgente su arreglo definitivo; y que así se recomienda al Consejo.

"Y a petición del Consejero Sr. Monserrat, la Comisión también acuerda dar al Sr. Walker un voto unánime de confianza, autorizándole para terminar este asunto, conforme a su mejor criterio, y ultimar los detalles necesarios de esta negociación."

Este acuerdo se tomó a iniciativa de M. A. Walker, vicepresidente del banco y quien actuaba como presidente en ausencia de Rafael Fabián, y daba amplias facultades a Walker para dar finalidad al asunto y así lo hizo en la práctica con la sola diferencia de que la corporación que remató

los bienes de la Central deudora fué organizada o incorpo-
rada de acuerdo con las leyes de la República de Santo Do-
mingo.   Parece que este cambio se realizó por consejo del
abogado que representaba al banco en Santo Domingo y el
cual en nada alteraba el propósito de asegurar sólidamente
el banco su deuda.

Por otra parte, si bien Fabián aparece como uno de
los administradores de la Central Boca Chica, lo era, sin em-
bargo, nominalmente, pues quien realmente dirigía la cen-
tral y entendía en todos sus negocios era el presidente de la
corporación, Miguel Guerra Parra.   Nada demuestra que el
demandado participara en las reuniones del consejo de ad-
ministración ni que tomara parte en sus deliberaciones y
resoluciones.   Un hecho, además, significativo y de singular
importancia es que desde el 1921 el estado económico de la
Central Boca Chica ya era bien poco satisfactorio.   A pesar
de que en la memoria anual de julio 31, 1921, del cuarto
ejercicio de la corporación, se habla de sus excelentes con-
diciones financieras, es lo cierto que la central tuvo pérdi-
das durante dicho ejercicio.   Se explican los motivos, infi-
riéndose de ellos que en nada puede imputarse a actos de
mala administración por sus directores.   En la memoria, en
las páginas 5 y 6, se dice lo siguiente:

> "La gran baja que sufrió el azúcar en el presente año, compa-
> rada a ningún otro producto de este país y luego la crisis comercial,
> fueron partes principales de la desmoralización que han sufrido los
> Colonos, lo que ha dado por resultado que el tiro de la caña en una
> semana no daba más que para dos días de molienda, y, tanto así
> siguió esta irregularidad que después de terminada la zafra, el día
> 9 de Julio, se quedaron en los campos más de quince mil toneladas
> de caña."

La desmoralización entre colonos parece que siguió en la
zafra de 1921–22, pero se debió sin duda a la situación de
insolvencia en que se encontraba la corporación.   Ésta care-
cía de fondos para pagar en dinero el azúcar a sus colonos
y éstos llegaban a la factoría con canastos para recoger di-

cho producto, el que se disputaban entre ellos a medida que se fabricaba y salía de los aparatos. La crisis fué más grave con la carencia de fondos para pagar las deudas vencidas y atender a los diferentes gastos que exige una central para ponerla en condiciones de moler. Parece que finalmente las diligencias y gestiones del presidente de la corporación para negociar un préstamo y hacer frente a la situación no tuvieron éxito, y entonces vino la ejecución por el banco de su hipoteca, la reclamación de la Compañía Industrial de Santo Domingo por cierto crédito refaccionario, embargando y retirando de la central lanchas y carros y las reclamaciones de otros acreedores. La Central Boca Chica trató de resistir la ejecución del banco impugnando la validez de la hipoteca, pero el presidente de la Central Boca Chica declaró en la junta de accionistas de octubre 5, 1922, que la oposición a la ejecución del banco fué más bien para dilatar los procedimientos por no existir nada que fuese vulnerable en cuanto a sus méritos. De este modo, sin embargo, se llegó por los demás acreedores al plan de reorganización a que se refiere el juez inferior en sus conclusiones.

[2] Los apelantes exigen en todo caso responsabilidad al demandado por omisiones suyas en los deberes que le imponían los cargos que desempeñaba, sosteniendo que la corte inferior erró al no declarar probada la demanda en ausencia de prueba por parte del demandado. Sin que sea necesario detenernos a considerar el aspecto legal de tal proposición, los apelantes establecen la premisa de que una vez probados los hechos y la intervención que en ellos tuvo el demandado, a éste correspondía descargarse, dar explicaciones, demostrando que hizo todo lo que pudo porque las cosas ocurrieran de distinta manera y sin perjuicio para los apelantes. Como los hechos no han sido probados tal como se alegan en la demanda, ni menos que el demandado interviniera de algún modo en los mismos, no existe base para establecer la conclusión a que se intenta llegar por dichos apelantes.

[3] Discuten los apelantes la imposición de costas. Alegan que su acción puede estar equivocada pero no es temeraria. La corte inferior, sin embargo, ejerció su discreción al imponer las costas a los demandantes y por el resultado del pleito no encontramos motivos para revocar ese particular de la sentencia.

*Por todo lo expuesto, debe confirmarse la sentencia apelada.*

: El Juez Asociado Sr. Hutchison no tomó parte en la resolución de este caso.